1
2
3
4
5
6
7

8                     UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  BAL SEAL ENGINEERING, INC., a California corporation, | Case No. SACV13-01880 JLS (KESx) |
| 12 | |
|              Plaintiff, | **FINAL PRETRIAL CONFERENCE** |
| 13 | **ORDER** |
|    vs. | |
| 14 | Final Pretrial Conference |
| 15  NELSON PRODUCTS, INC., a Colorado corporation, CARL | Date:  April 26, 2019 |
|    NELSON, and DOES 1-5, inclusive, | Courtroom:  10A |
| 16 | Time:  10:30 a.m. |
|              Defendants. | |
| 17 | Complaint Filed:  December 3, 2013 |
|   NELSON PRODUCTS, INC., a | Trial Date:  December 2, 2019 |
| 18  Colorado corporation, | |
| 19 | Hon. Josephine L. Staton |
|             Counterclaimant, | |
| 20     vs. | |
| 21  BAL SEAL ENGINEERING, INC., a California corporation, | |
| 22 | |
|             Counterdefendant. | |
| 23 | |

24  ///

25  ///

26  ///

27  ///

28  ///

# **TABLE OF CONTENTS**

1.    THE PARTIES AND PLEADINGS .............................................................. 3

2.    JURISDICTION AND VENUE.................................................................... 4

3.    TRIAL DURATION ..................................................................................... 4

4.    JURY TRIAL ............................................................................................... 4

5.    ADMITTED FACTS .................................................................................... 4

6.    STIPULATED FACTS ................................................................................. 4

7.    PARTIES' CLAIMS AND DEFENSES ...................................................... 6

8.    REMAINING TRIABLE ISSUES ............................................................. 23

8a.   ADDITIONAL REMAINING TRIABLE ISSUES PER DEFENDANTS ....... 24

9.    DISCOVERY ............................................................................................. 25

10.   PRETRIAL DISCLOSURES ..................................................................... 26

11.   JOINT EXHIBIT LIST .............................................................................. 26

12.   JOINT WITNESS LIST ............................................................................. 27

13.   LAW AND MOTION MATTERS/MOTIONS *IN LIMINE*..................... 27

14.   BIFURCATION ......................................................................................... 28

15.   STATEMENT OF COMPLIANCE ........................................................... 28

///

///

///

///

///

///

///

///

///

///

Following pretrial proceedings, and pursuant to FED. R. CIV. P. 16 and L.R. 16,

**IT IS ORDERED:**

**1.    The parties are:**

- Plaintiff and Counterdefendant, Bal Sal Engineering, Inc. ("Plaintiff" or "Bal Seal");

- Defendant and Counterclaimant, Nelson Products, Inc. ("NPI"); and

- Defendant, Carl Nelson.   (NPI and Carl Nelson will hereinafter be referred to collectively as "Defendants".)

Each of these parties has been served and has appeared.   All other parties named in the pleadings that are not identified in the preceding paragraph are now dismissed.

**The pleadings which raise the issues are:**

- First Amended Complaint (Doc. 38); and

- Second Amended Answer and Counterclaim (Doc. 60).

**The Court Orders which dismiss claims/defenses in pleadings:**

- Court Order Granting Bal Seal's Motion for Partial Summary Judgment dated August 3, 2018 (Doc. 303); and

- Court Order Granting the Parties' Joint Stipulated Motions *in Limine* dated August 27, 2018 striking "affirmative defenses" that are not affirmative defenses.   (Joint Motion *in Limine* number 10, Doc. 357, page 5).

- Court Order dated January 30, 2019 Granting Bal Seal's Motion *in Limine* No. 7 to Strike Defendants' Impertinent Affirmative Defenses (Doc. 472).

**2.      Federal jurisdiction and venue are invoked upon the grounds:**

It is stipulated that subject matter jurisdiction over this action existed upon filing under 28 U.S.C. Sections 1331, 1332(a), and 1338(a) and (b), and venue is proper in this District and this Division pursuant to 28 U.S.C. Section 1391(b) and (c).

**3.      The Court has ordered a 12-day jury trial, in accordance with the parties' estimates.**

The parties' trial time will be divided evenly and tracked by the Court.  The 12-day period encompasses all aspects of the trial except deliberations, including voir dire, opening statements, evidence presentation, closing arguments and jury instruction.  The parties have also agreed that an advance questionnaire may be sent to prospective jurors that would time-qualify them to serve in a jury trial that is expected to last 12 total court days, plus deliberation time.  The Court reserves the right to allot less time if the parties are not efficient in presenting the case to the jury.

**4.      The parties have served and filed the following operative documents for the jury trial:**

(a)      Proposed Jury Instructions (Doc. 502-1) as required by Section III.E. of the Civil Trial Order (as last revised on March 31, 2017).  *See also*, L.R. 51-1 for additional instructions concerning the proposed Jury Instructions;

(b)      Special Verdict Form(s) (Doc. 458) as required by Section III.E. of the Civil Trial Order; and

(c)      Special questions requested to be asked to prospective jurors on voir dire (Docs. 454, 455), as required by Section III.C. of the Civil Trial Order.

No further amendments to the above-referenced documents are permitted

1    absent leave of the Court.

2

3    **5.    The following facts are admitted and require no proof**:

4        (a)    Mr. Peter Balsells is the founder and sole shareholder of Bal Seal.

5        (b)    Mr. Carl Nelson is the founder and sole shareholder of NPI.

6

7    **6.    The following facts, though stipulated, shall be without prejudice to any**

8        **evidentiary objection**:

9        (a)    Bal Seal and NPI are competitors.

10       (b)    Bal Seal inquired about the possibility of acquiring NPI in May/June

11              2012.

12       (c)    Bal Seal sued NPI and Carl Nelson on December 3, 2013.

13       (d)    Bal Seal and NPI manufacture and sell canted coil springs.

14       (e)    As to the Bal Seal customers at issue in this case, Bal Seal did not charge

15              them upfront for any design work included in the Drawings.

16       (f)    Bal Seal does not have non-disclosure agreements with all of its

17              customers in its Third Amended Identification of Trade Secrets.

18       (g)    Bal Seal's written policies have elevating levels of restrictions on access

19              and use depending on whether information is internally designated as

20              "Confidential"; "Proprietary", or "Trade Secret."

21       (h)    Bal Seal's policies require the use of specific printed legends/stamps on

22              electronic and printed records identifying the appropriate level of

23              internal classification.

24       (i)    Bal Seal has a vault room in which it stores certain trade secret

25              information, including designs for manufacturing equipment.

26       (j)    Bal Seal does not permit customers access to the vault room even if they

27              have an NDA with Bal Seal.

28       (k)    None of the alleged trade secrets at issue in this case are stored on Bal

5

Seal's Black Network.

(l)     Bal Seal customers do not have access to the black network even if they have an NDA with Bal Seal.

(m)     Bal Seal sales representatives do not have access to the Bal Seal Black Network.

(n)     Only Bal Seal employees with the need to know have access to information on the Black Network.

(o)     Bal Seal's design proposals contained a "proprietary" legend.

(p)     Bal Seal's design proposals were not marked as "trade secrets".

(q)     Bal Seal's catalogs at various times are put on Bal Seal's website.

(r)     Bal Seal's catalogs can be shared with potential customers even with no NDA.

(s)     At least one customer, Glenair, was dissatisfied with Bal Seal's products, causing it to look elsewhere for canted coil springs.

**7.      Claims and Defenses of the Parties.**

In accordance with Fed. R. Civ. P. 16(c), the parties will be precluded from presenting claims or defenses at trial not set forth in this Order, in the manner required by this Order, unless this Order is later modified by the Court to prevent manifest injustice.

**Plaintiff's Position is as Follows:**

(a)     **Plaintiff, Bal Seal plans to pursue the following claim against Defendants**:

**Claim 1:**      Plaintiff, Bal Seal's claim for unjust enrichment and injunctive relief arises out of its contention that Defendants misappropriated its trade secrets (its customer product design solutions) in the form of a "Proposal Drawing" or a "Top Level Drawing" of the part(s) recommended by Bal Seal (collectively, the

"Drawings") transmitted to Defendants by the customer or by way of a communication of the *information contained on those Drawings* transmitted by the customer (either directly or indirectly) to Defendants via e-mail, telephone communication, descriptive part number or otherwise.   Plaintiff claims that Defendants have violated the California Uniform Trade Secrets Act ("CUTSA") codified at California Civil Code §§ 3426 *et seq.*

    (b)    **The elements required to establish Plaintiff's claim is**:

**Claim 1**:    **Indirect Misappropriation of Trade Secrets.**

1)    Plaintiff owned the product design solutions it developed for its customers;

2)    The product design solutions were valid trade secrets at the time of the misappropriation by defendants;

3)    Defendants acquired the trade secret from someone other than Plaintiff;

4)    Defendants knew or had reason to know before the use that the information was a trade secret and knew or had reason to know that the disclosing party was breaching a duty of confidentiality by disclosing it;

5)    Defendants used Plaintiff's trade secret without Plaintiff's authorization; and

6)    Defendants were unjustly enriched as a direct and proximate result of Defendants' use.

[*See California Police Activities League v. California Police Youth Charities, Inc.,* No. 08–1991, 2009 WL 537091, at *3 (N.D.Cal. March 3, 2009); *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1114 (N.D. Cal. 2012); *Steinberg Moorad & Dunn, Inc. v. Dunn*, No. CV 01-07009 RSWL(RZX), 2002 WL 31968234, at *23 (C.D. Cal. Dec. 26, 2002)

**To prove that the Plaintiff's product design solutions were trade secrets, Plaintiff must prove all of the following:**

1) That the Plaintiff's product design solutions for its customers were secret;

2) That Plaintiff's product design solutions for its customers had actual or potential independent economic value because they were secret; and

3) That Plaintiff made reasonable efforts to keep the product design solutions secret.

[*See,* Judicial Council of California Civil Jury Instruction 4402.; Civil Code §3426.1(d); and *Abba Rubber Co. v. Seaquist*, *et al.*, 235 Cal.App.3d 1, 18 (1991).]

///

**Secrecy Requirement**

The secrecy required to prove that something is a trade secret does not have to be absolute in the sense that no one else in the world possesses the information. It may be disclosed to employees involved in Plaintiff's use of the trade secret as long as they are instructed to keep the information secret.  It may also be disclosed to nonemployees if they are obligated to keep the information secret.  However, it must not have been generally known to the public or to people who could obtain value from knowing it.

[*See,* Judicial Council of California Civil Jury Instruction 4403.]

**Reasonable Efforts**

To establish that Plaintiff's product design solutions are a trade secret, Plaintiff must prove that it made reasonable efforts under the circumstances to keep them secret.  "Reasonable efforts" are the efforts that would be made by a reasonable business in the same situation and having the same knowledge and resources as Plaintiff, exercising due care to protect important information of the same kind.

[*See,* Judicial Council of California Civil Jury Instruction 4404.]

**Misappropriation by Use**

Defendants misappropriated Plaintiff's trade secret product design solutions for customers by use if defendants:

1)   used them without Plaintiff's consent; and

2)   at the time of use, knew or had reason to know that their knowledge of Plaintiff's trade secrets came from or through third party customers, and that those customers had a duty to Plaintiff to maintain the secrecy of Plaintiff's product design solutions and/or to limit the use of the product design solutions that the customers had received from Plaintiff.

[*See,* Judicial Council of California Civil Jury Instruction 4407; Civil Code Section 3426.1(b)(2)(B)(iii).]

**To prove that the Defendants were unjustly enriched, Plaintiff must prove that:**

1)   Defendants' indirect misappropriation of Bal Seal's trade secrets caused NPI or Carl Nelson to receive a benefit that it or he otherwise would not have achieved.

[*See,* Judicial Council of California Civil Jury Instructions 4410; Civil Code §3426.3].

**To prove that Plaintiff is entitled to injunctive relief, Plaintiff must prove that:**

1)   If not enjoined, defendant, NPI and/or Carl Nelson will continue to derive a commercial advantage from the continued misappropriation.

[ Cal. Civ. Code §3426.2].

(c)     **In brief, the Key Evidence Plaintiff relies on for each claim is:**

**Claim 1**:     **Indirect Misappropriation of Trade Secrets.**

1)     **Plaintiff owned its product design solutions for its customers.**

Plaintiff intends to present documentary and testimonial evidence showing that Plaintiff developed and owns the product design solutions provided to its customers and prospective customers.  This evidence includes:

     a.     Plaintiff designs and manufactures canted coil springs and related components for its customers. Most of its designs are custom designs where the springs and related components are specially designed and made for a particular customer's application;

     b.     Plaintiff did not charge its customers at issue for its design work; and

     c.     Customers are advised via legends on the Drawings that depict the products to be made are "proprietary" to Bal Seal and, in the Terms and Conditions of Sale that no use or disclosure of the information depicted is permitted without Plaintiff's permission.

2)     **Plaintiff's product design solutions were trade secrets at the time of the misappropriation by Defendants.**

See evidence identified below in relation to the elements necessary to prove that Plaintiff's product design solutions were trade secrets.

3)     **Defendants improperly acquired and used the trade secrets without Plaintiff's consent.**

Plaintiff intends to present documentary and testimonial evidence showing that Defendants improperly acquired Plaintiff's trade secrets.  This includes evidence

that:

    a.    Defendants' business model relied heavily on the copying/duplication of canted coil spring designs originating largely from Plaintiff;

    b.    Defendants utilized at least one former distributor of Plaintiff's to direct former customers of Plaintiff to Defendants thereby allowing Defendants to capture millions of dollars in business formerly directed to Plaintiff;

    c.    Defendants received from customers the material and dimensional specifications of Plaintiff's parts in various forms, including without limitation, Plaintiff's drawings, customer drawings (copied from Plaintiff's drawings), the conversion of Plaintiff's part specifications into an NPI part number via the conversion matrix on the NPI website, Plaintiff's descriptive part numbers, e-mail or other written transmissions, and verbal communications; and

    d.    Defendants were aware (or should have known) of the originator of the source of the original design solutions (Plaintiff) they received from the customers, but elected to ignore that information and actively made Plaintiff's parts and, in fact, solicited Plaintiff's business and its design solutions from customers.

    e.    Bal Seal never consented to Defendants acquiring or using its trade secrets in any manner.

4)    **Plaintiff was harmed, and Defendants were unjustly enriched.**

Plaintiff intends to present documentary and testimonial evidence showing that

Defendants' acquisition and use of Plaintiff's trade secret product design solutions was a substantial factor in causing Plaintiff's harm and that Defendants have been unjustly enriched.  This evidence includes:

       a.    Defendants obtained business from Plaintiff's customers without having to develop the engineering solutions themselves.   By improperly obtaining and copying Plaintiff's design solutions, Defendants saved substantial money in development costs (and were able to sell the products at a lower cost) all to their benefit in the form of unjust enrichment, at the expense of Plaintiff who lost that business and has been damaged accordingly.

5)   **Defendants' acquisition and use of Plaintiff's product design solutions was a substantial factor in causing Plaintiff's harm and Defendants to be unjustly enriched.**

Plaintiff intends to present documentary and testimonial evidence showing that Defendants' acquisition and use of Plaintiff's trade secret product design solutions was a substantial factor in causing Plaintiff's harm and that Defendants have been unjustly enriched.  This evidence includes:

       a.    Defendants have sold parts to customers that are virtual duplicates of the same parts that Plaintiff had designed for those customers originally.   Defendants were provided with the specifications (originally developed by Plaintiff) for those parts by the customer and then proceeded to make and sell those parts to that customer, thereby evading development costs.   Defendants have been unjustly enriched at Plaintiff's expense; and

       b.    Defendants are *continuing* to make sales of the parts based upon Plaintiff's trade secret design solutions provided by the customer to Defendants, and for this reason, Plaintiff seeks a permanent

injunction prohibiting further sales, use and disclosure of this
information and the return thereof to prevent further irreparable
harm.

**Evidence in support of the elements necessary to prove Plaintiff's product
design solutions were trade secrets:**

    1)    **Plaintiff's product design solutions for its customers were secret.**

Plaintiff intends to present documentary and testimonial evidence showing that
Plaintiff's design solutions were not generally known.  This includes evidence that:

    a.    The product design solutions are specific to a given customer and
to that customer's particular needs;

    b.    Product design solutions for a particular customer are not shared
with any third parties, including other customers;

    c.    Product design solutions for a customer are not published by
Plaintiff in catalogs or otherwise;

    d.    Plaintiff restricts use of and access to its Drawings to its personnel
with a need to know;

    e.    All of Plaintiff's employees have executed non-
disclosure/confidentiality agreements that contractually restrict
their use and disclosure of customer Drawings and other trade
secrets owned by Plaintiff;

    f.    The use and disclosure by the customer of design solutions
prepared for it by Plaintiff are restricted by one or more of the
following: (i) Non-disclosure agreements ("NDA"); (ii)
proprietary legends on the face of the Drawings; and (iii) the
Terms and Conditions of Sale that accompany the Drawings;

    g.    Plaintiff's internal designation of the Drawings as "proprietary"
instead of "trade secret" does not suggest that the actual treatment

of the Drawings by Plaintiff is insufficient in order to obtain and maintain trade secret status under the law, but rather is a designation under Plaintiff's internal multi-tiered secrecy classification system to allow for the more efficient handling of materials by multiple employees in order to meet customer timetables and expectations.

///

2)   **Plaintiff's product design solutions had actual or potential independent economic value because they were secret.**

Plaintiff intends to present documentary and testimonial evidence showing that Plaintiff's product design solutions had independent economic value that was made possible by decades of developmental experience ("know-how") resulting from an investment of time and money by Plaintiff in research, development and engineering; sales of the products to customers resulting in profits to Plaintiff; and an investment of effort and resources in protecting the secrecy of Plaintiff's trade secrets generally and of the product design solutions specifically.  This includes evidence that:

a.   Plaintiff's primary business over the life of the company during the last 50 years (plus) has been the research and development of canted coils spring design, fabrication, and the development of canted coil spring applications;

b.   Plaintiff has invested millions of dollars and years of effort in becoming expert in canted coil spring technology;

c.   Plaintiff has captured its extensive experience in the function and application of canted coil springs (including those solutions that work best and those that do not work, or work less well) in its extensive library and in its computer programs that allow its engineers to arrive at the optimum solution for its customers' needs;

d.   Plaintiff has sold the products depicted in its Drawings to its customers and has received payment therefor and has earned a profit on such sales; and

e.   Plaintiff has implemented extensive secrecy measures over decades to protect is trade secrets (including its product design solutions) from unauthorized disclosure and use.

3)   **Plaintiff made reasonable efforts to keep the product design solutions secret.**

Plaintiff intends to present documentary and testimonial evidence showing that Plaintiff's product design solutions were the subject of reasonable efforts under the circumstances to maintain their secrecy.  This includes evidence that:

a.   Plaintiff restricts the use of and access to its Drawings to its personnel with a need to know;

b.   All of Plaintiff's employees have executed non-disclosure/confidentiality agreements that contractually restrict their use and disclosure of customer Drawings and other trade secrets owned by Plaintiff;

c.   The use and disclosure by the customer of design solutions prepared for it by Plaintiff are restricted by one or more of the following: (i) Non-disclosure agreements ("NDA"); (ii) proprietary legends on the face of the Drawings; and (iii) the Terms and Conditions of Sale that accompany the design solutions (Drawings); and

d.   Plaintiff's internal designation of the Drawings as "proprietary" instead of "trade secret" does not suggest that the actual treatment of the Drawings by Plaintiff is insufficient in order to obtain and maintain trade secret status under the law, but rather is a designation under Plaintiff's internal multi-tiered secrecy

classification system to allow for the more efficient handling of
materials by multiple employees in order to meet customer
timetables and expectations.

///

///

///

**Evidence in Support of Plaintiff's claim that Defendants were unjustly enriched:**

Plaintiff intends to present documentary and testimonial evidence showing that
Defendants were unjustly enriched by the acquisition and use of Plaintiff's trade
secret product design solutions.  This evidence includes:

  a.  Defendants have sold parts to customers that are virtual duplicates
      of the same parts that Plaintiff had designed for those customers
      originally.  Defendants were provided with the specifications
      (originally developed by Plaintiff) for those parts by the
      customer, and then proceeded to make and sell those parts to that
      customer, thereby evading development costs.  Defendants have
      been unjustly enriched at Plaintiff's expense; and

  b.  Defendants are *continuing* to make sales of the parts based upon
      Plaintiff's trade secret design solutions provided by the customer
      to Defendants, and for this reason, Plaintiff seeks a permanent
      injunction prohibiting further sales, use and disclosure of this
      information and the return thereof to prevent further irreparable
      harm.

**Evidence in Support of Plaintiff's Request for Injunctive Relief:**

Plaintiff intends to present documentary and testimonial evidence showing that
Plaintiff is entitled to injunctive relief.  This evidence includes:

  a.  Defendants continue to sell parts to customers that are virtual

duplicates of the same parts that Plaintiff had designed for those customers originally.    Defendants were provided with the specifications (originally developed by Plaintiff) for those parts by the customer, and then make and sell those parts to that customer, thereby evading development costs.  Defendants have been, and continue to be, unjustly enriched at Plaintiff's expense; and

b.    Defendants are *continuing* to make sales of the parts based upon Plaintiff's trade secret design solutions provided by the customer to Defendants, and for this reason, Plaintiff seeks a permanent injunction prohibiting further sales, use and disclosure of this information and the return thereof to prevent further irreparable harm.

**Defendants' Position is as Follows:**

(a)    **Defendants/Counterclaimant NPI plan to pursue the following counterclaims/affirmative defenses**:

- Declaratory Judgment of No trade secret;
- Plaintiff's trade secrets are readily ascertainable;
- The claimed trade secrets were independently developed by NPI;
- Exceptional Case (post-trial matter).

(b)    **The elements required to establish Defendants/Counterclaimant NPI's counterclaim and affirmative defenses are**:

NPI specifically pled independent derivation in the Amended Answer and Counterclaim. Dkt. at 60.  NPI's Sixth Affirmative Defense pled that Plaintiff's alleged trade secrets are readily ascertainable through proper means and thus do not qualify for protection as a trade secret. *Id*. at 7. NPI's Seventh Affirmative Defense

pled that Plaintiff's claimed trade secrets were independently developed by Defendants. *Id.* at 8.

///

- NPI's Fourth Counterclaim is Declaratory Judgment of No Trade Secret. ECF No. 60. The elements to establish this claim is to prove that Bal Seal has failed to meet one of the elements under California Civil Code §3426.1(d) and under California Civil Jury Instruction 4401

- NPI did not misappropriate Bal Seal's alleged trade secrets if NPI proves that the Drawings were readily ascertainable by proper means at the time of the alleged acquisition/use. CACI 440; *see also Abba Rubber Co. v. Seaquist*, 235 Cal. App. 3d 21 n. 9 (1991) citing WEST'S ANN. CIV. CODE, §3426.1; *see also, Imax Corp. v. Cinema Techs.*, 152 F.3d 1161, 1168 n. 10 (1998).

Information that is generally known to the public or to persons in the relevant industry is not trade secret. *See American Paper & Packaging Prods., Inc. v. Kirgan,* 183 Cal.App.3d 1318, 1326 (1986). "It was not 'secret,' for it consisted essentially of general engineering principles in the public domain and part of the intellectual equipment of technical employees." *Winston Research Corp. v. Minnesota Min. & Mfg. Co.* 350 F.2d 134, 139 (1965). A trade secret loses its status as a secret when it is made available to members of the relevant industry. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002 (1984) (information that is generally known in an industry cannot be a trade secret); *see also DVD Copy Control Assn'n, Inc. v. Bunner*, 116 Cal. App. 4th  251 (2004) (suggesting that information is not a secret if it has become generally known to potential competitors).

- A case is "exceptional" under § 285 simply if it "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the

facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness*, 134 S. Ct. 1749, 1751 (2014).   Evidence supporting the exceptional case is shown by Bal Seal's dismissal of claims for patent infringement knowing that the patents were procured by fraud.

(c)   **In brief, key evidence Defendant relies on for each counterclaim and affirmative defense is**:

**Declaratory Judgment of No Trade Secret**

    **1.**    **Bal Seal top level drawings are not trade secrets**

Bal Seal witnesses from the company's owner to the president on down to Bal Seal engineers and salesmen all testified that Bal Seal does not treat the drawings as trade secrets, because according to President Richard Dawson, if they did so, Bal Seal could not do business.  ECF No. 204-1, SUF Nos. 12, 59.  Bal Seal's submitted evidence supports this fact. ECF No. 239-73, ¶¶10-11.  Bal Seal does not protect its top level proposal drawings as if they were trade secrets because Bal Seal freely shares these drawings with customers and potential customers even when those customers do not have non-disclosure agreements with Bal Seal.  ECF No. 239-73, ¶16.

    **2.**    **Bal Seal did not provide trade secret drawings to each of the eleven (11) allegedly affected customers**

Bal Seal never supplemented its Third Amended Identification of Trade Secrets to include the design proposals and engineering drawings for 150 of the 191 customers in the document.  This failing is critical because Bal Seal issued over 20 (twenty) subpoenas in this case including all of the remaining eleven (11) customers.

If those customers – or NPI – possessed and produced evidence supporting Bal Seal's allegations of misappropriation, then Bal Seal would have supplemented its trade secret identification.  In fact, some of the customers remaining 11 customers conducted no business with Bal Seal.  NPI had requested that Bal Seal supplement its discovery responses but Bal Seal has failed to do so. Bal Seal should not be allowed to supplement this information during trial.

### 3.     Bal Seal has no evidence that any of the eleven (11) customers provided Bal Seal's allegedly trade secret drawings for any of the 146 accused parts to NPI.

In its summary judgment order, the Court concluded that "Bal Seal identified customers together with design solutions (including specifications) and engineering drawings.  (*See* Defendants' MSJ Exhibit 31).  ECF No. 303 citing ECF No. 204-32.  However, Bal Seal's Third Amended Identification does not identify the eleven (11) customers together with the design solutions and engineering drawings for the 146 accused parts.  ECF No. 204-32.  Bal Seal has failed to produce documents in discovery to establish essential aspects of its trade secret claim for the remaining eleven (11) customers on a part by part basis for the 146 accused parts.  Specifically, Bal Seal failed to produce in discovery the following: A) the Bal Seal sales proposal drawings transmitted to each of the eleven (11) customers for all of the 146 accused parts; B) any document or other communication from those same eleven (11) customers to NPI that either provides the allegedly trade secret drawing from those same eleven (11) customers; C) evidence in response to NPI's discovery requests demonstrating use of the Bal Seal drawings for manufacture of the same accused part after receiving the alleged trade secret.  Bal Seal's Part Connection Binder was produced after the close of discovery and fails to prove the misappropriation on a customer by customer and part-by-part basis and is not admissible under any theory.
///

**4.      NPI did not use the top level drawings or any other representations
of Bal Seal's alleged secrets**

Bal Seal's theory of this case is that its customers received and then transmitted
the supposedly trade secret top level drawings to NPI, and that NPI then used the Bal
Seal drawings to make competing parts.  Yet Bal Seal did not provide any evidence
from the remaining eleven (11) customers.   In fact, Glenair's 30(b)(6) witness
testified that it conducted an internal investigation and concluded that there was no
Bal Seal trade secret information that was transmitted to NPI.  ECF No. 204-1 at SUF
114.  Similarly, no NPI witness gave any such testimony, and in fact all NPI witnesses
testified exactly the opposite; NPI never made use of any Bal Seal drawing, even in
the few instances when potential customers transmitted them unsolicited to NPI.
There is a complete lack of evidence supporting Bal Seal's claim for all of the eleven
(11) customers and 146 parts.

**5.      Bal Seal cannot prove damages by any alleged misappropriation**

Bal Seal asserts that "[m]any parts listed, sold for minimal amounts and, for
efficiencies purposes, were not incorporated into Bal Seal's overall damages totals."
ECF No. 239-53 at ¶11.  The only available evidence is that Bal Seal customers left
Bal Seal for NPI because they were unhappy with Bal Seal's performance or the cost
of Bal Seal's parts.  There is no evidence Bal Seal lost any business due to any
alleged misappropriation of claimed trade secrets.  Bal Seal only submitted proof of
damages for the eleven (11) remaining customers and 146 remaining accused
products.  Bal Seal should not be allowed to improperly amend its expert damages
report to include damages other than the remaining eleven (11) customers.   NPI did
not conduct business with 123 out of the 191 customers in the Third Amended
Identification of Trade Secret List.  ECF No. 361-1.

///

///

**6.      Bal Seal cannot prove that Mr. Nelson was personally involved**

Bal Seal abandoned its alter ego theory by not adding it to its amended complaint.  Bal Seal has not shown that Mr. Nelson personally received, used or disclosed even one of the alleged Bal Seal trade secrets.  NPI never used a Bal Seal top level drawing to make a part or secure an order for a part from any customer. ECF No. 204-1.  The exhibits that this Court relied on in its summary judgment order concerned emails from customer representatives are not among the remaining 11 customers in Bal Seal's trade secret claim.  ECF No. 303.  Mr. Nelson did not know and had no reason to know that Bal Seal's customers had a duty to not disclose Bal Seal's alleged trade secrets in their possession even though they were only designated as "proprietary".  ECF No. 204-4.  Mr. Nelson did not authorize, direct, or permit any person employed by NPI, or any agent of NPI to use any of Bal Seal's trade secrets. *Id*.


**7.      Not Readily Ascertainable** There is no fixed standard for determining what is "readily ascertainable by proper means."  In general, information is readily ascertainable if it can be obtained, discovered, developed, or compiled without significant difficulty, effort, or expense.  Bal Seal's Drawings are readily ascertainable because the measurements are available in its catalogs.

Judicial Council of California Civil Jury Instruction 4420, Judicial Council of California Civil Jury Instruction 4420


**8.      Independent Development/Reverse Engineering**

During his depositions, Mr. Nelson was asked questions about NPI's reverse engineering efforts including the brands, models, and colors of calipers that NPI's personnel used for reverse engineering.  Dkt. 449-40 at ¶¶29-34.  Mr. Nelson also discussed NPI's Micro-Vu digital inspection machine and Vertical Optical

comparator.   Mr. Nelson also testified regarding the methodology for reverse engineering and the specific measurements made.  *Id*.  Mr. Nelson testified that he designed springs using a product catalog.  Dkt. 369-2   at 120:1-1.Mr. Nelson testified that he would prefer receiving a sample to reverse engineer over a customer drawing.   *Id*.   Mr. Nelson confirmed that NPI frequently reverse engineers springs.  ECF No. 448-2 at 229:14-232:3.  Mr. Gary Henderson is an NPI employee who has a bachelor of science in aerospace engineering and a master's degree.  Dkt. 369-5 at 11:17-25.   Mr. Henderson also testified that he performs reverse engineering based on measurements from parts on a regular basis.  *Id*. at 76:6-80:24.  He testified that it would only take him thirty (30) second to measure a canted coil spring that is cut and welded.  *Id*.  Mr. Kinsey, an employee also testified that NPI has performed reverse engineering of parts.  ECF No. 448-6 at 118:18-24.  Bal Seal did not request from any of NPI's witnesses for samples of the springs that were used for reverse engineering. Dkt. 449-40 at ¶34.

Bal Seal had unfettered access to NPI's 70 reverse engineering springs from January 31, 2019 to March 22, 2019 and kept copies of the Accused Product springs.


**8.     Remaining Triable Issues (Agreed Upon by all Parties)**

        In view of the admitted facts and the elements required to establish the claims and affirmative defenses, the following ultimate issues remain to be tried:

> (i)     Whether Bal Seal's engineering design solutions qualify as trade secrets under California law.
>
> (ii)    Whether Bal Seal's alleged trade secrets have independent economic value.
>
> (iii)   Whether Bal Seal's customers were willing to pay for parts engineered and manufactured by Bal Seal.
>
> (iv)    Whether Bal Seal undertook reasonable efforts to maintain the secrecy of its alleged trade secrets.

23

(v)   Whether Bal Seal's efforts were reasonable under the circumstances to keep the alleged trade secret a secret.

(vi)   Whether Mr. Nelson had reason to know that Bal Seal's customers were in possession of Bal Seal's alleged trade secrets.

(vii)   Whether Mr. Nelson had reason to know that Bal Seal's customers had acquired the alleged trade secret and were breaching a duty of confidentiality by disclosing it.

(viii)   Whether Bal Seal's alleged trade secrets were indirectly misappropriated by Defendants.

(ix)   Whether the indirect misappropriation caused damage to Bal Seal and if so, whether Bal Seal can establish damages in the form of lost profits, unjust enrichment or a reasonable royalty under the California Uniform Trade Secrets Act ("CUTSA").

(x)   The amount of any damages (as defined above) due from Defendants to Bal Seal.

(xi)   Whether the indirect misappropriation was willful and malicious justifying an award of exemplary damages and/or attorneys' fees and costs to Bal Seal under the CUTSA.

(xii)   Whether Bal Seal has established its entitlement to injunctive relief under the California Uniform Trade Secret Act.

**8a.   Additional Remaining Triable Issues Per Defendants.**

(i)   Whether Bal Seal's alleged trade secrets can be reverse engineered in their entirety, either from a top-level drawing or from inspecting the part.

(ii)   Whether Bal Seal advised customers that it would be receiving its alleged trade secrets.

(iii)   Whether Bal Seal put its customers on notice that they were

violating non-disclosure agreements.

(iv)     Whether Bal Seal considers information in its sales catalogs to be trade secrets.

(v)      Whether Bal Seal engineers worked jointly with its customers' engineers to develop the top level drawings.

(vi)     Whether Bal Seal did anything to remedy the disclosure of trade secrets post December 2013.

(vii)    Whether Mr. Nelson knew or had reason to know that the alleged trade secrets were secret and that the disclosure was a mistake.

(viii)   Whether NPI had a regular practice/pattern of acquiring Bal Seal's asserted trade secrets.

(ix)     Whether Bal Seal is entitled to damages before December 2010.

**9.     All discovery is complete**.

**10.    All Pretrial Disclosures under FED. R. CIV. P. 26(a)(3) were required to be made at least thirty (30) days before trial, as required by FED. R. CIV. P. 26(a)(3)(B)**.

**11.    Joint Exhibit List.**

Local Rule 16-6.3 states that "[t]he list of objections required by [Fed. R. Civ. P.] 26(a)(3)(B) shall be included in the proposed Final Pretrial Conference Order." The parties filed their first iteration of the Joint Exhibit List on January 4, 2019. (Doc. 457-1.) In accordance with Local Rule 16-6.3, they filed a list of objections to those exhibits along with the Proposed Final Pretrial Conference Order that was filed on December 31, 2018. (Doc. 451-2.) However, when Bal Seal lodged the parties' Amended Proposed Pretrial Conference Order on April 15, 2019, it did not include or incorporate by reference a list of exhibit objections. (Doc. 492-1.) Without

requesting leave of the Court, the parties have since filed a First Amended Joint Exhibit List (Doc. 503-1) and a Second Amended Joint Exhibit List (Doc. 531). Neither of these documents was accompanied by a list of objections to each exhibit. No further amendments to the Exhibit List are permitted absent leave of the Court.

Unless the parties agree that an exhibit shall be withdrawn, all exhibits on the Second Amended Joint Exhibit not specifically objected to in Doc. 451-2 or in writing before the November 20, 2019 Exhibit Conference will be admitted without objection at trial

**12.    Joint Witness List.**

The parties have filed their First Amended Joint Witness List. (Doc. 493.) No further amendments are permitted absent leave of the Court.  Only the witnesses identified on the joint witness list and not otherwise excluded by Order of the Court are permitted to testify (other than solely for impeachment).

**13.    The following law and motion matters and motions *in limine*, and no others, are pending or contemplated**:

None.

**14.    Bifurcation.**  Neither party filed a motion to bifurcate, and the Court finds that bifurcation of liability and damages is not warranted.

///
///
///
///
///

**15.     Statement of Compliance.**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pre-Trial Order shall supersede the pleadings, and govern the course of the trial of this cause, unless modified to prevent manifest injustice.


DATED: November 18, 2019

_____

HONORABLE JOSEPHINE L. STATON
UNITED STATES DISTRICT COURT JUDGE